UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In Re:<br><br>TORGOVY DOM<br><br>EX PARTE APPLICATION FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782 TO OBTAIN DISCOVERY FOR USE IN A FOREIGN PROCEEDING | Case No. |

**DECLARATION OF VLADIMIR PESTRIKOV IN SUPPORT OF *EX PARTE* APPLICATION OF TORGOVY DOM KATOIL OOO FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782 TO OBTAIN DISCOVERY FOR USE IN A FOREIGN PROCEEDING**

**DECLARATION OF VLADIMIR PESTRIKOV**

I, Vladimir Pestrikov, hereby declare and state as follows:

1. I am a partner with the Advocates Bureau of the City of Moscow RGP, counsel for Torgovy Dom KAToil OOO ("Torgovy Dom") in connection with the contemplated legal proceedings against Victoria Sokolova ("Sokolova" or "Defendant"), before the Moscow Arbitrazh Court of the Russian Federation ("Russian Court").

2. The contemplated foreign proceeding ("Foreign Proceeding") arises out of the fraudulent scheme perpetrated against Torgovy Dom by Sokolova, who abused her position as Chief Financial Officer in Russia for Torgovy Dom's parent company, C.A.T. oil AG ("CAToil") by participating in a scheme to defraud Torgovy Dom out of many tens of millions of dollars, for which Sokolova received over six million dollars in purported bonuses and consulting fees from the other participants in the fraudulent scheme. The Foreign Proceeding will include claims for, among other things, breach of fiduciary duty, damages for civil tort, and unjust enrichment, to recover the moneys wrongfully received by Sokolova as her reward for her participation in this fraudulent scheme.

3. I am admitted to practice law in Russia and have been qualified as such since 2000. I practice out of my firm's office in Moscow, Russia.

4. I submit this declaration in support of Torgovy Dom's Application to the United States District Court of the Southern District of New York, pursuant to 28 U.S.C. § 1782 (the "Application"), for authorization to take discovery in the form of subpoenas requesting the production of documents from Citibank, N.A ("Citibank"), JP Morgan Chase Bank, N.A. ("Chase"), Bank of New York Mellon, N.A. ("BNY"), Bank of America, N.A.("BOA"), and Wells Fargo Bank, N.A. ("Wells Fargo") (collectively, "Respondent Banks"), as well as The Clearing House Payments Company L.L.C. ("CHIPS"), for use in the Foreign Proceeding.

5. Except where I indicate to the contrary, the facts and matters contained in this declaration are based on my personal knowledge. Where facts are not within my personal knowledge, I have identified my sources of information and belief. Insofar as facts relate to Torgovy Dom and Sokolova, these are known to me as a result of information I received from or at the direction of Torgovy Dom, and are true to the best of my knowledge, information or belief. To the extent matters

stated in this declaration are statements of legal opinion, such statements represent my view of Russian law, based on 20 years of experience as a practicing attorney in Russia.

### A. The Parties to the Contemplated Foreign Proceedings.

6. Torgovy Dom KAToil OOO is a Russian limited liability company. Torgovy Dom is a wholly owned subsidiary of Petro Welt Technologies AG ("PeWeTe"), formerly known as C.A.T. oil AG, an Austrian corporation that is publicly traded on the Frankfurt Stock Exchange. Between 2009 and 2015, Torgovy Dom served as the purchasing agent for CAToil's operating subsidiaries (the "Operating Subsidiaries"), purchasing hundreds of millions of dollars in equipment and spare parts from the United States and Europe for use by the Operating Subsidiaries.

7. Victoria Sokolova served as the Chief Financial Officer of CAToil for Russia and the CIS from 2006 until 2015. Sokolova also served as the head of CAToil's Moscow representative office, which supervised the activities of Torgovy Dom, during this same time period, so that Sokolova owed fiduciary obligations to Torgovy Dom under Russian law.

8. Sokolova reported directly to Anna Brinkmann, who served as CAToil's Chief Operating Officer and Chief Risk Officer during this period.

### B. The Fraudulent Procurement Scheme

9. CAToil's Operating Subsidiaries depend on the provision of particular goods, such as hydraulic motors, valves, drilling and connecting units, sensors and measuring equipment sourced from international suppliers in the United States and Europe. As purchasing agent for the Operating Subsidiaries, Torgovy Dom purchased hundreds of millions of dollars in equipment and spare parts from suppliers in the United States and Europe between 2009 and 2015.

10. International procurement for Torgovy Dom was coordinated by Edward Brinkmann, as head of CAToil's international procurement, to which position he was appointed by his mother, Anna Brinkmann – who controlled CAToil and its subsidiaries through her position as CAToil's largest shareholder, Chief Operating Officer, Chief Risk Officer, and member of its Management Board.

11. The procurement system implemented by Anna Brinkmann and Edward Brinkmann (collectively, the "Brinkmanns") prohibited Torgovy Dom from purchasing parts and equipment

directly from US or European suppliers, and instead required such purchases to be made through a series of intermediary companies inserted into the process at the direction of Edward Brinkmann. Each time the goods passed through an intermediary company, they were subject to an artificial mark-up in price before the goods and equipment were ultimately sold to Torgovy Dom at artificially-inflated prices, which were substantially higher than what Torgovy Dom would have paid if it purchased the same goods and equipment directly from the US and European suppliers.

12. This procurement scheme imposed by the Brinkmanns resulted in Torgovy Dom overpaying for purchased goods by tens of millions of dollars. These markups were then transferred by the intermediary companies at Edward Brinkmann's direction to other third party entities owned, controlled, or affiliated with the Brinkmanns, such as Hard Sun Invest & Trade Corp. ("Hard Sun"), a Panama corporation. A true and correct copy of an affidavit from the manager of one of these intermediary entities, Baltic Oil, along with its English translation, attaching representative examples of such wire transfers, is attached hereto as **Exhibit 4.**

13. As CAToil's Chief Financial Officer for Russia and the CIS and the head of CAToil's Moscow Representative Office (which was responsible, in part, for supervising Torgovy Dom's operations), Sokolova was a critical part of the procurement scheme. Indeed, she was a co-founder and initial 50% shareholder of Baltic Oil, the intermediary company which ultimately sold the fraudulently marked up goods to Torgovy Dom. As her reward, Sokolova received at least six million dollars in purported "bonuses" from Anna Brinkmann and consulting fees from Hard Sun, one of the intermediary entities to which the markups were transferred at the direction of Mr. Brinkmann. True and correct copies of the affidavit from the Chief Executive Officer of UPM Limited ("UPM"), the investment management firm owned by Anna Brinkmann wherein Sokolova kept the above-referenced six million dollars, as well as the affidavit of Sokolova (along with its English translation), reflecting same, are attached hereto as **Exhibits 1 and 2**, respectively.

C. **Efforts to Informally Resolve the Dispute Prove Unsuccessful**

14. On October 12, 2020, Torgovy Dom sent a demand letter to Sokolova, outlining some of the wrongful conduct by Sokolova uncovered to date, and advising that Torgovy Dom would commence litigation against Sokolova in the Russian courts to recover the sums misappropriated by

Sokolova unless the parties are able to informally resolve this dispute. A true and correct copy of that demand letter, dated October 12, 2020, along with its English translation, is attached hereto as **Exhibit 3**.

15. To date, Sokolova has refused to respond to Torgovy Dom's demand letter or to return the sums misappropriated by her pursuant to the above-described fraudulent scheme.

16. Accordingly, Torgovy Dom intends to file the Foreign Proceeding against Sokolova in the near future.

### D. Relevant Information in Possession by Respondent Banks and CHIPS

17. Based on a sworn affidavit from the Chief Executive Officer of UPM, as well as Sokolova's own prior sworn testimony, Torgovy Dom has evidence that Sokolova received at least six million dollars in purported "bonuses" and/or "consulting fees" into her UPM-managed bank accounts at Hellenic Bank Public Company Ltd., Credit Suisse (UK) Limited and Bethmann Bank AG, and then transferred those moneys to her accounts at Eurobank Cyprus Ltd. True and correct copies of the affidavit from UPM's CEO and correspondence from Sokolova reflecting same, are attached hereto as **Exhibits 1** and **5**, respectively.

18. Torgovy Dom is informed and believes that the above-referenced accounts were held jointly by Sokolova and her daughter, Victoria Sokolova Junior, who presently resides in the United States, and had asked UPM how to transfer these funds to the United States. This is confirmed by the Affidavit from UPM's CEO (see Ex. 1) and the correspondence attached hereto as Exhibit 5.

19. Torgovy Dom is informed and believes that Citibank, Chase, BNY, BOA, and Wells Fargo (i.e., the five Respondent Banks) each have correspondent accounts for one or more of the above-referenced banks through which Sokolova transferred her gains from the fraudulent scheme, as described in the concurrently filed Declaration of Jeff Kurzon and supporting exhibits.

20. Torgovy Dom is also informed and believes that CHIPS – a privately owned system for electronic payments transferred and settled in US dollars for cross-border transactions – was used to transfer the proceeds of the fraudulent scheme to and from Sokolova, and, thus, should also have information relevant to the Foreign Proceeding, as described in the concurrently filed Declaration of Jeff Kurzon and supporting exhibits.

### E.  The Relief Requested in This Application

21. The Arbitrazh Court of the City of Moscow is a court of first instance in the Russian Federation. The Arbitrazh Court is a court for civil commercial claims, and not an arbitration tribunal.

22. I am not aware of any reason a Russian Court would not accept judicial assistance from a U.S. court or that seeking documentary evidence in the U.S. via a subpoena would circumvent any Russian proof-gathering restrictions or policies. Russian law does not prohibit a party from seeking evidence abroad by whatever legal means are available to it.

23. The discovery sought in the Application will be relevant and important to Torgovy Dom in the Foreign Proceeding, as it will help establish: (i) Sokolova's receipt of funds misappropriated from Torgovy Dom; (ii) confirm that these funds were sent to Sokolova by the Brinkmanns or entities owned by or affiliated with the Brinkmanns; and (iii) trace and recover the misappropriated funds.

24. The Respondent Banks and CHIPS will not be parties to the Foreign Proceeding

25. WHEREFORE, for the reasons set forth above, I respectfully request that the Court expeditiously grant the Application for an Order granting Torgovy Dom leave to serve the Respondent Banks and CHIPS with the Subpoenas requested in the Application.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the law of the United States of America that the foregoing is true and correct.

Executed on this 26 day of November, 2020, in Moscow, Russian Federation.

_____
Vladimir Pestrikov